**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

FILED

00 NOV 24 AM II: 51

U.S. DISTRICT COURT
N.D. OF ALABAMA

LARRY D. GRAY,　　　　　　　　)
　　　　　　　　　　　　　　　)
　　　Plaintiff,　　　　　　　)
　　　　　　　　　　　　　　　)
vs.　　　　　　　　　　　　　)　　Civil Action No. CV-98-S-3120-S
　　　　　　　　　　　　　　　)
WIRE ROPE CORPORATION　　　　)
OF AMERICA, INCORPORATED,　　)
　　　　　　　　　　　　　　　)　　ENTERED
　　　Defendant.　　　　　　　)

NOV 24 2000

**MEMORANDUM OPINION**

Plaintiff alleges that, while employed by defendant, he was

subjected to unlawful racial discrimination in violation of Title

VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e

*et seq.*, and 42 U.S.C. § 1981. Plaintiff specifically claims that

defendant subjected him to a racially hostile work environment,

failed to promote him to a customer service representative position

due to his race, and constructively discharged him when the

discriminatory atmosphere in his workplace became unbearable.

Plaintiff's complaint also includes state law claims which allege

that defendant negligently and/or wantonly trained, supervised, and

retained its employees, an act which plaintiff alleges was the

proximate cause of the harassment inflicted upon him. This action

is now before the court on defendant's motions for summary judgment

1



(doc. no. 10) and to strike affidavits (doc. no. 23). These motions will be addressed in reverse order.

## I. DISCUSSION

### A.   Defendant's Motion to Strike

Defendant asks this court to strike the affidavits of Larry D. Gray, Jason McCoy, Victor Allen, and Billy Ray Hood. Defendant contends that large portions of these affidavits contain statements that are conclusory, irrelevant, contrary to prior testimony, not based on personal knowledge, or hearsay.

#### 1.   The use of hearsay

The Federal Rules of Civil Procedure require that affidavits submitted in opposition to a motion for summary judgment "shall be made on personal knowledge,[1] shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(e) (emphasis supplied).[2]

---

[1] Affidavits based on "information and belief" are not competent evidence. See Automatic Radio Manufacturing Co., Inc. v. Hazeltine Research, Inc., 339 U.S. 827, 831, 70 S.Ct. 894, 896, 94 L.Ed. 1312 (1950).

[2] In full text, Fed. R. Civ. P. 56(e) provides that:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary

Thus, the evidence upon which a non-moving party may rely when opposing summary judgment must be admissible at trial. *See, e.g., Victoria L. by Carol A. v. District School Board*, 741 F.2d 369, 373 (11th Cir. 1984) ("In adjudicating a motion for summary judgment, a court may consider any evidence that would be admissible at trial."); *Samuels v. Doctors Hospital, Inc.*, 588 F.2d 485, 486 & n.2 (5th Cir. 1979);[3] *Broadway v. City of Montgomery*, 530 F.2d 657, 661 (5th Cir. 1976) ("Evidence [that is] inadmissible at trial cannot be used to avoid summary judgment."); *Roucher v. Traders & General Insurance Co.*, 235 F.2d 423, 424 (5th Cir. 1956) ("[E]vidence inadmissible on a hearing of the case would generally be inadmissible on a motion for summary judgment, except that the court may hear the matter on affidavits...."); *Soles v. Board of Commissioners of Johnson County, Georgia*, 746 F.Supp. 106, 110 (S.D. Ga. 1990) ("The court may consider only that evidence that would be admissible at trial.").

---

judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

[3] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

Even so, the evidence need not be in an admissible <u>form</u> when
presented in opposition to the motion for summary judgment.  As the
Eleventh Circuit has observed, "<u>otherwise admissible</u> evidence [may]
be submitted in <u>inadmissible form</u> at the summary judgment stage,
though  at  trial  it  must  be  submitted  in  admissible  form."
*McMillian v. Johnson*, 88 F.3d 1573, 1584 (11th Cir. 1996) (emphasis
in original) (citing *Offshore Aviation v. Transcon Lines, Inc.*, 831
F.2d 1013, 1017 (11th Cir. 1987) (Edmondson, J., concurring)[4]),

---

[4] The panel majority in *Offshore Aviation* relied upon the following
language from the Supreme Court's opinion in Celotex Corp. v. Catrett, 477 U.S.
317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), to hold that inadmissible hearsay
evidence may be considered when ruling upon a motion for summary judgment:

> We do not mean that the nonmoving party must produce evidence
> in a <u>form</u> that would be admissible at trial in order to avoid
> summary judgment.  Obviously, Rule 56 does not require the non-
> moving party to depose her own witnesses.  Rule 56(e) permits a
> proper summary judgment motion to be opposed by any of the kinds of
> evidentiary  materials  listed  in  Rule  56(c),  except  the  mere
> pleadings themselves, and it is from this list that one would
> normally expect the nonmoving party to make the showing to which we
> have referred.

*Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553-54 (emphasis supplied); Offshore
Aviation v. Transcon Lines, Inc., 831 F.2d 1013, 1015 (11th Cir. 1987) (*per
curiam*).  Judge Edmondson filed a separate opinion, concurring in the judgment
reached in *Offshore Aviation*, but emphasizing that the quoted passage from
*Celotex* merely clarifies the non-moving party's right to oppose a summary
judgment motion with any of the materials listed in Rule 56(c), including
affidavits of that party's own witnesses that may contain testimony in a "form"
not admissible at trial:

> I doubt ... that inadmissible hearsay can be properly used to oppose
> summary judgment, especially if it is not shown that admissible
> evidence to the same effect will be available at trial.
>      . . .
> Probably, the Supreme Court was only emphasizing [in the
> quoted passage from *Celotex*] that otherwise admissible evidence can
> be submitted in the shape of an affidavit at the summary judgment

*aff'd on other grounds sub nom. McMillian v. Monroe County, Alabama*, 520 U.S. 781, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997).

In other words, while otherwise admissible evidence may be submitted in an inadmissible form in opposition to a motion for summary judgment — *e.g.*, in the form of an affidavit containing hearsay statements — if that hearsay would not be admissible when later offered at a trial, then it may not be used to defeat summary judgment.[5]

---

stage, although at trial such a document would be inadmissible and, instead, a live witness or deposition would have to be used to present the evidence.  ...

*Offshore Aviation*, 831 F.2d 1016-17 (Edmondson, J., concurring).

[5] *See also* Schwarzer, Hirsch & Barrans, The Analysis and Decision of Summary Judgement Motions (Federal Judicial Center 1991), providing that:

The facts on which the nonmovant may rely must be admissible at trial, but need not be in admissible form as presented in the opposition.  ...

To permit an opposition to be based on evidence that would not be admissible at trial would undermine the goal of the summary judgment procedure to prevent unnecessary trials, since inadmissible evidence could not support a jury verdict.  A distinction must be drawn, therefore, between the affidavit of a party's own witness — which can be converted into admissible testimony at trial — or an opponent's admission, and a statement reciting the testimony of an independent or adverse witness that would be barred as hearsay. (The testimony of such a witness would normally have to be submitted in the form of a deposition.)

Of course, a nonmovant's mere promise to produce admissible evidence will not suffice to defeat summary judgment.  And unauthenticated documents or hearsay evidence should not be considered without adequate assurance that their contents can be proved by admissible evidence at trial.  To overcome these evidentiary hurdles, the nonmovant may resort to discovery under Rule 56(f) to convert inadmissible evidence into admissible form or to discover admissible evidence.

Many of the hearsay objections of defendant are based on their inadmissable form in the affidavit.  As noted above, their current inadmissable form is not fatal if the declarant can be called to testify to what he did, or what activity he witnessed.

Also, many of the statements objected to are not offered to prove the truth of the matter asserted.  Fed. R. Evid. 801.  *See United States v. Jennings*, 527 F.2d 862, 869 (5th Cir. 1976) (finding that where a statement is offered merely to show that the statement was made, the statement is not hearsay).

### 2.   Supervisory admissions

Furthermore, some of the out-of-court statements were made by supervisors employed by defendant.  When statements are made by an employee of the defendant, concerning matters within the scope of their employment, the statements are not hearsay when used against the defendant.  Fed. R. Evid. 801(d)(2)(D).

Applying the principles discussed in the two, preceding sections to the affidavits in question, this court finds that defendant's motion to strike, insofar as it is based on hearsay is due to be denied.

### 3.   Conclusory allegations

"Conclusory allegations without specific supporting facts have

_____

*Id.* at 50-51 (footnotes omitted).

6

no probative value" and, hence, may properly be struck by a district court. *Evers v. General Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985); *see also Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 642 (11th Cir. 1998) (affiant's statements that defendant's facility was a "racially hostile environment," or that "there was a racially biased attitude by management towards" black employees, were properly struck as conclusory).

Therefore, the conclusory statement in paragraph six of Billy Ray Hood's statement is due to be struck.[6] Other objections by defendant to statements made by Jason McCoy (paragraph 28), Larry Gray (paragraph 10), and Victor Allen (paragraph 15), in which the declarants refer to a "hostile work environment" or "racial harassment," would appear conclusory at first glance. They are, however, clearly a singular reference to specific instances cited in previous paragraphs by the affiants (*i.e.,* specific racial slurs, treatment of African-American employees, actions taken by defendant's employees, etc.) and, therefore, should not be struck because they are supported by specific facts.

**4.   "Sham affidavits"**

---

[6] Hood testified in his affidavit that "[w]hile Tommy was not nice to a lot of the employees, it was my personal observation from working with both Tommy and Larry that Tommy was harder on Larry than the rest of us because he was black." Plaintiff's evidentiary submission (doc. no. 15), Exhibit 14 (Hood affidavit), ¶ 6.

The defendant next moves to strike Larry Gray's affidavit based on perceived inconsistencies between statements in that document and his deposition testimony. "When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Van T. Junkins & Assoc., Inc. v. U.S. Industries, Inc.*, 736 F.2d 656, 657 (11th Cir. 1984).

Every discrepancy within an affidavit, however, does not justify a "court's refusal to give credence to such evidence." *Kennett-Murray Corp. v. Bone,* 622 F.2d 887, 894 (5th Cir. 1980). The Eleventh Circuit has stated that "allow[ing] every failure of memory or variation in a witness's testimony to be disregarded as a sham would require far too much from lay witnesses and would deprive the trier of fact of the traditional opportunity to determine ... with which words the witness ... was stating the truth." *Tippens v. Celotex Corp.* 805 F.2d 949, 953-954 (11th Cir. 1986).

The defendant cites Larry Gray's affidavit, paragraph 8, and his reference to "numerous" complaints of racial harassment as

being inconsistent with his prior deposition testimony.  At his deposition, however, plaintiff testified to many occasions where he complained to employees of defendant.[7]  The court finds that any deviations in Larry Gray's affidavit and his deposition testimony are not "blatantly inconsistent and inherently inexplicable" and merely "create an issue of credibility."  *Holley Equipment Co. v. Credit Alliance Corp.*, 821 F.2d 1531, 1537 (11th Cir. 1987) (citing *Tippens*, 805 F.2d at 953).  The court also finds the defendant's other objections based on inconsistency to be without merit.

In summary, only the conclusory statement contained in paragraph six of Billy Ray Hood's statement is due to be struck and, accordingly, will be disregarded by the court.  The remainder of defendant's motion to strike is denied.  When ruling on a summary judgment motion, a court will "disregard only the inadmissible portions of a challenged affidavit and will consider the admissible portions in determining whether to grant or deny the [summary judgment] motion."  *Lee v. National Life Assur. Co. of Canada*, 632 F.2d 524, 529 (5th Cir. 1980).

---

[7] *Id.*, Exhibit 2 (deposition of plaintiff), at 138, 145, 173-175, 177-180, 246, 272, 279.

9

**B.    Defendant's Motion for Summary Judgment**

    **1.    Standards of review**

Federal Rule of Civil Procedure 56(c) provides, in relevant part, that summary judgment not only is proper, but "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

The moving party bears the initial burden of showing the court, by reference to materials on file, that no genuine issues of material fact exist to be decided at trial.  *See generally Celotex Corp., supra; Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991).  The movant discharges this burden by "showing" or "pointing out" to the court there is an absence of evidence to

10

support the non-movant's case.  *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995) (*per curiam*).  Rule 56 permits the movant to discharge this burden with or without supporting affidavits.  *See Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553.

When the moving party has discharged its burden, the non-movant must go beyond the pleadings and designate specific facts showing there is a genuine issue for trial.  *See Jeffery*, 64 F.3d at 593.  The nonmoving party must put forth more than a "mere 'scintilla'" of evidence; instead, "there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).

In deciding whether the movant has met its burden, the court is obligated to draw all inferences from the evidence presented in the light most favorable to the non-movant and, also, to resolve all reasonable doubts in that party's favor.  *See generally Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Inferences in favor of the non-movant are not unqualified, however.  "Mere general allegations which do not reveal detailed and precise facts will not prevent the award of summary judgment."  *Resolution Trust Corporation v. Dunmar Corporation*,

11

43 F.3d 587, 592 (11th Cir. 1995) (citation omitted).  Moreover,

evidence that is merely colorable, *see Brown v. City of*

*Clewiston*, 848 F.2d 1534, 1537 (11th Cir. 1988), conclusory, *see*

*Peppers v. Coates*, 887 F.2d 1493, 1498 (11th Cir. 1989), or

conjectural, does not create a genuine issue of material fact.

Thus, if a reasonable fact finder evaluating the evidence

could draw more than one inference from the facts, and if that

inference introduces a genuine issue of material fact, then the

court should not grant summary judgment.  *See Augusta Iron &*

*Steel Works v. Employers Insurance of Wausau*, 835 F.2d 855, 856

(11th Cir. 1988).  A "genuine" dispute about a material fact

exists if the "evidence is such that a reasonable jury could

return a verdict for the nonmoving party."  *Jeffery*, 64 F.3d at

594 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248,

106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)).  The bottom line is

"whether the evidence presents a sufficient disagreement to

require submission to a jury or whether it is so one-sided that

one party must prevail as a matter of law."  *Anderson*, 477 U.S.

at 251-52, 106 S.Ct. at 2512.

With the foregoing standards in mind, the following facts

either are not disputed or are stated in a light most favorable

12

to plaintiff.

### 2.  Summary of facts

Plaintiff, Larry D. Gray, who is of African-American heritage, was employed by the defendant, Alabama Sling and Wire Rope Corporation of America, for approximately two years, from August of 1995 to August 27, 1997.[8]  Defendant manufactures ropes, cables, and slings used for lifting heavy loads or objects.  Plaintiff was employed at defendant's facility in Dolomite, Alabama, where he worked as a general laborer.[9]  Although plaintiff normally was scheduled to work the "second shift" (*i.e.*, between the hours of 3:00 p.m. and 11:00 p.m.), he would, on occasion, work the first (7:00 a.m. to 3:00) shift.[10]  Except for an employee named Victor Allen, plaintiff was the only African-American employee on the second shift.[11]

When working the second shift, plaintiff was initially supervised by Coy Williams,[12] and when working the first shift, he was supervised by Frank Collier.[13]  During his employment at

---

[8] Plaintiff's evidentiary submission (doc. no. 15), Exhibit 2 (deposition of plaintiff), at 142.

[9] *Id.* at 109-110.

[10] *Id.*, Exhibit 6 (declaration of plaintiff), ¶ 3.

[11] *Id.* at ¶ 5.

[12] *Id.*, Exhibit 2 (deposition of plaintiff), at 112.  While working on second shift, Williams would direct and coordinate the employees' work and, at times, would cut rope for pending jobs.  *Id.* at 128-129.

[13] *Id.* at 113.

defendant's Dolomite facility, plaintiff had no performance problems and received good evaluations.[14]

In November of 1996, Tommy McDow replaced Coy Williams as the plaintiff's supervisor[15] on the second shift.[16]  According to plaintiff, McDow was his direct supervisor.[17]  Like the supervisor before him, McDow would occasionally cut rope for pending jobs, and would direct and coordinate the employees' work.[18]  Frank Collier, a shop supervisor for defendant, testified that Tommy McDow did have authority to supervise the laborers, and refusing to follow his directions could be deemed insubordination.[19]

When plaintiff heard that Tommy McDow would be taking Williams' position, he informed two of his supervisors, Frank Collier and Danny Simmons, defendant's operations manager, that he would not feel comfortable with McDow in a supervisory position

---

[14] *Id.*, Exhibit 4 (Simmons deposition), at 53; *Id.*, Exhibit 5 (Smith deposition),at 41.

[15] This position is often referred to by the deponents as "working lead man." *See, e.g., id.*, Exhibit 1 (Collier deposition), at 35.

[16] *Id.*, Exhibit 6 (declaration of plaintiff), ¶ 6; *id.*, Exhibit 2 (deposition of plaintiff), at 133.

[17] *Id.*, Exhibit 7 (McCoy declaration), ¶ 3.  Jason McCoy, a co-worker of plaintiff's, stated that, like the plaintiff, he was employed by defendant as a laborer, worked on the night shift with plaintiff, and his "direct supervisor" was McDow.

[18] *Id.*, Exhibit 2 (deposition of plaintiff), at 133; *id.*, Exhibit 4 (Simmons deposition), at 37.  To further demonstrate that McDow was a supervisor, plaintiff contends that one employee was fired at the insistence of McDow. Plaintiff, however, offered no evidence beyond this statement to support this assertion.

[19] *Id.*, Exhibit 1 (Collier deposition), at 34-35.

14

over him.  Plaintiff's discomfort stemmed from the fact that he had been informed by Victor Allen, an African American co-worker, and Tim Paul, the only African-American supervisor at defendant's facility, that McDow was a racist and that he did not like persons of African-American heritage.[20]  Plaintiff's supervisors told him, "don't worry about it."[21]

When McDow assumed his new position as lead man over the second shift, plaintiff contends that he became a victim of racially discriminatory treatment.  Plaintiff alleges that McDow treated him and Victor Allen differently than the white employees. For example, McDow would allow the white employees to take breaks, and stop working before their shifts were over, but often would not allow the black employees breaks, and required them to work longer than scheduled.[22]  McDow frequently directed profanity and racial slurs at the plaintiff.[23]  On several occasions, McDow referred to plaintiff as a "nigger"[24] or a "black bastard," and on more than one occasion told plaintiff that "Blacks can't do nothing right."[25] McDow used similar derogatory terms when referring to Victor

---

[20] *Id.*, Exhibit 2 (deposition of plaintiff), at 139-140, 214.

[21] *Id.* at 211.

[22] *Id.* at 309-310.

[23] *Id.* at 262-263.

[24] *Id.* at 152-153, 175, 225.

[25] *Id.* at 153, 252, 254.

15

Allen.[26]  McDow also said that plaintiff must be a drug dealer, because he is black, has a beeper, and carries cash.[27]  These pejorative comments were heard by several of plaintiff's co-workers.[28]

On a workday in March of 1997, McDow became verbally abusive to plaintiff, calling him a "nigger."[29]  McDow had been drinking on the job and smoking marijuana prior to this outburst.[30]  The following morning, plaintiff informed Frank Collier of the incident.[31]  In response, Collier agreed with plaintiff, saying "I think you're right.  I think Tommy is a racist too."[32]  That same day, plaintiff complained to another supervisor, Tim Paul.  In response, Paul said, "I wish he would say them things to me, I'd knock him out."[33]  Plaintiff contends that he also reported these incidents to defendant's operations manager, Danny Simmons.[34]  Significantly, however, no corrective actions were undertaken.

Other employees in defendant's facility regularly engaged in

---

[26] *Id.*, Exhibit 2 (deposition of plaintiff), at 152-153.

[27] *Id.*, Exhibit 6 (declaration of plaintiff), ¶ 8.

[28] *Id.*, Exhibit 7 (McCoy declaration), ¶ 8 (McDow also referred to plaintiff as "bitch" and "motherfucker.").

[29] *Id.*, Exhibit 2 (deposition of plaintiff), at 175.

[30] *Id.*

[31] *Id.* at 175, 179.

[32] *Id.* at 173.

[33] *Id.* at 177.

[34] *Id.*, Exhibit 7 (McCoy declaration), ¶ 16.

16

racially offensive conduct. Tommy McDow's brother, Bobby Joe McDow, worked as a re-spooler at the Dolomite facility. Although his schedule was not identical to plaintiff's, Bobby Joe McDow worked around plaintiff on a fairly regularly basis.[35] He uttered the racial slur "nigger" on a daily basis,[36] expressed his admiration for Adolf Hitler,[37] and frequently made Nazi hand gestures in the plaintiff's presence, while uttering phrases such as "white power" and "suck it."[38] Bobby Joe kept a biography of Adolf Hitler on his desk and displayed a confederate flag over his work station.[39] According to plaintiff, the flag was in plain view, and could be easily observed by employees who worked at defendant's facility.[40] Plaintiff contends that Frank Collier and Danny Simmons were aware of the flag, but did nothing about it.[41]

According to plaintiff, other supervisors also used racially offensive language. Frank Collier reiterated Tommy McDow's opinion that plaintiff must be a "drug dealer," because he was black,

---

[35] *Id.*, Exhibit 3 (McDow deposition), at 54.

[36] *Id.*, Exhibit 7 (McCoy declaration), ¶ 19.

[37] *Id.* at ¶ 27.

[38] *Id.*, Exhibit 2 (deposition of plaintiff), at 193-195; *id.*, Exhibit 3 (McDow deposition), at 79.

[39] *Id.*, Exhibit 7 (McCoy declaration), ¶ 6.

[40] *Id.*, Exhibit 14 (Hood declaration), ¶ 8; *id.*, Exhibit 6 (declaration of plaintiff), ¶11; *id.*, Exhibit 7 (McCoy declaration), ¶ 6.

[41] *Id.*, Exhibit 14 (Hood declaration), ¶ 8.

17

carried a beeper, and had cash.[42]  Plaintiff complained of this statement to Danny Simmons, defendant's operations manager, who told plaintiff "not to worry about it."[43]  Plaintiff contends that Collier and Danny Simmons also commonly used the term "nigger" when referring to African-American employees.[44]

Victor Allen, plaintiff's African-American co-worker, resigned from defendant's employment in 1997.  He testified that his resignation came after his repeated complaints to supervisors and managers pertaining to the racially hostile work environment went unanswered.  Allen was repeatedly referred to by Tommy McDow as "nigger" and "boy."[45]  Allen complained about the use of racial slurs to Danny Simmons on numerous occasions in 1996.[46]  Simmons' response was that Allen shouldn't worry about it, and that Simmons would handle McDow.  Allen likewise complained to Frank Collier about McDow's behavior, who agreed with Allen that McDow did not like persons of African-American heritage.[47]  Allen also complained to Ralph Smith, then the general manager of the Dolomite facility, about the abusive environment.  Allen testified that, despite his

---

[42] *Id.*, Exhibit 2 (deposition of plaintiff), at 145.
[43] *Id.*
[44] *Id.*, Exhibit 7 (McCoy declaration), ¶ 22.
[45] *Id.*, Exhibit 8 (Allen declaration), ¶ 5.
[46] *Id.* at ¶ 9.
[47] *Id.* at ¶ 10

16

complaints, Smith took no remedial action.[48]

Similarly, plaintiff contends that he complained about McDow's behavior to his supervisors, Frank Collier and Danny Simmons, on "numerous occasions" prior to leaving defendant's employment in August of 1997.[49]  Plaintiff states that he specifically told his supervisors about the offensive behavior mentioned above, and that co-workers can testify to such complaints.[50]  Plaintiff also considered bringing his complaints to the attention of defendant's general manager, Ralph Smith.  According to the plaintiff, however, "[Simmons] wouldn't let me talk to Ralph.  He said that he would handle it."[51]

Plaintiff asserts that, despite his repeated complaints, defendant failed to take any action against either Tommy McDow or Frank Collier.[52]  Although plaintiff complained about the work environment on numerous occasions, he contends he did not do so more often because he thought it would be futile.[53]

Plaintiff contends that his complaints were sufficient under defendant's policy proscribing discrimination in the workplace.

---

[48] *Id.* at ¶ 11.

[49] *Id.*, Exhibit 6 (declaration of plaintiff), ¶ 8.

[50] *Id.*, Exhibit 7 (McCoy declaration), ¶ 14-15.

[51] *Id.*, Exhibit 2 (deposition of plaintiff), at 138.

[52] *Id.*, Exhibit 6 (declaration of plaintiff), ¶ 10.

[53] *Id.* at ¶ 11.

The policy requires that employees suffering from harassment should
"report the act immediately to [their] supervisor." Upon receiving
such complaints, the supervisor "is required to promptly advise
Human Resources" and an "investigation will be undertaken
immediately."[54] Supervisors of plaintiff testified that a report
of one employee referring to another employee as a "nigger," or
suggesting that an employee was a drug dealer because he was black,
carried cash, and had a beeper, would be grounds to conduct such an
investigation.[55]

Plaintiff contends that the racially hostile work environment
became so unbearable, and defendant's response to his complaints
was so inadequate, that he was forced to resign on August 27, 1997.
Prior to his resignation, on August 20, 1997, plaintiff had an
annual performance evaluation and review with Danny Simmons.[56] At
this meeting, Simmons offered plaintiff a fifty-cent an hour raise,
due to plaintiff's favorable job performance.[57] Because plaintiff
perceived Simmons' offer as paltry, in light of McDow's harassment,
plaintiff requested a higher raise.[58] Simmons responded that was

---

[54] Defendant's evidentiary submission (doc. no. 12), Exhibit 6.

[55] Plaintiff's evidentiary submission (doc. no. 15), Exhibit 4 (Simmons
deposition) at 83; id., Exhibit 1 (Collier deposition), at 109, 123; id., Exhibit
5 (Smith deposition), at 91.

[56] Id., Exhibit 2 (deposition of plaintiff), at 163.

[57] Id. at 164, 166.

[58] Id. at 166-167.

not possible.[59]  Plaintiff then told Simmons that working with Tommy McDow "wasn't worth it," and gave notice of his intention to resign.[60]  Simmons retorted that plaintiff was "always complaining" and, if plaintiff quit, Simmons threatened to change "everything to bad" on plaintiff's previously positive evaluation.[61]  Plaintiff contends that he quit due to the racial harassment he endured, and states that the fact that he was not offered a larger raise had nothing to do with his decision.[62]

On his final day of work, August 27, 1997, plaintiff asked to meet with Ralph Smith, Frank Collier, and Danny Simmons.  This was plaintiff's first time to personally tell Ralph Smith of Tommy McDow's behavior.[63]  Plaintiff told Smith about the incidents where McDow had treated him harshly, referred to him as a "nigger," and reported that McDow often would drink or do drugs on the job.  He informed Smith that Simmons had actually caught McDow drinking on the job.[64]  Smith stated that he had not heard of these complaints

---

[59] Defendant's evidentiary submission (doc. no. 12) Exhibit 8 (Simmons affidavit) ¶ 9.

[60] Plaintiff's evidentiary submission (doc. no. 15), Exhibit 2 (deposition of plaintiff), at 169.

[61] *Id.* at 314-317.

[62] *Id.* at 169, 186.

[63] *Id.* at 183-184.

[64] *Id.*  Simmons stated that this was his first time hearing these complaints.

previously.[65]   After  airing  his  grievances  at  this  meeting,
plaintiff told the men that he was afraid to go back on the floor
with McDow for the remainder of the shift.  Smith told plaintiff he
could leave work early.[66]

On August 28, 1997, Ralph Smith investigated plaintiff's
complaints.  In response to a finding that Tommy McDow had consumed
alcohol and smoked marijuana on the job, threatened employees, and
stolen company property, Smith suspended McDow for five days, after
which he was terminated.[67]  The notes from defendant's investigation
do not contain any reference to plaintiff's complaints regarding
racial harassment.[68]  In addition, Smith testified that he did not
speak to any African-American employees regarding plaintiff's
allegations of racial harassment.[69]   Furthermore, Danny Simmons
indicated that, during the investigation, it would be the
employees' responsibility to come to management with their comments
or information regarding racial discrimination.[70] Simmons testified

> Q.   Did you or Mr. Smith talk to any [African-American
>      employees] about Mr. Gray's complaint that Tommy

---

[65] *Id.* at 187.

[66] *Id.* at 189

[67] Defendant's evidentiary submission (doc. no. 12) Exhibit 7 (Smith affidavit), ¶ 6.

[68] Plaintiff's evidentiary submission (doc. no. 15), Exhibit 4 (Simmons deposition), exhibit 2.

[69] *Id.*, Exhibit 5 (Smith deposition), at 67-68.

[70] *Id.*, Exhibit 4 (Simmons deposition), at 114-115.

       McDow might be a racist?

A.    Not that I recall, but I mean, they would have to
       let us know, if something like that was gong on.

Q.    You think so?

A.    Yes.

Q.    But you did not seek them out in your investigation
       to ask their thoughts on it?

A.    Not that I recall.[71]

Referring to management's investigation of plaintiff's August 27, 1997 complaint, Simmons stated that "there was never anything confirmed about Tommy, you know, saying racial slurs or anything like that."[72]

In his complaint, plaintiff includes a claim pertaining to defendant's failure to promote him to a customer service representative position, due to his race.[73] Plaintiff applied for the position during February of 1997.[74] This position was desirable to plaintiff because it paid more than his laborer position, was an office job, and was scheduled on the first shift.[75]

Despite the fact that defendant did _not_ have a written job

---

[71] _Id._

[72] _Id._ at 105.

[73] Complaint, count II.

[74] Plaintiff's evidentiary submission (doc. no. 15), Exhibit 2 (deposition of plaintiff), at 287.

[75] _Id._, Exhibit 6 (declaration of plaintiff), ¶ 12.

description, Danny Simmons, a former customer service representative for defendant, indicated that the primary responsibilities of the position entailed answering telephones, taking orders, and entering those orders in the computer.[76] Simmons added that answering customer inquiries was a large part of the service representative's duties and, hence, an in-depth knowledge of all products produced by defendant was crucial.[77]

Plaintiff contends that he was qualified for the position. In addition to holding an associate's degree in business administration from Lawson State Junior College, plaintiff had a working knowledge of defendant's products, the ability to decipher and understand customer requests, the ability to perform calculations and price jobs, and knowledge of defendant's shipping process.[78] Much of plaintiff's knowledge regarding defendant's business was gained from his experience working in different departments, such as the shipping, splicing, chain, and link belt departments.[79]

Plaintiff contends that the person selected to fill the position, Coy Williams, was not better qualified and, moreover, did

---

[76] *Id.*, Exhibit 4 (Simmons deposition), at 20.

[77] *Id.* at 29.

[78] *Id.*, Exhibit 6 (declaration of plaintiff), ¶ 13; *id.*, Exhibit 2 (deposition of plaintiff), at at 289.

[79] *Id.*, Exhibit 6 (declaration of plaintiff), ¶ 14.

24

not even have the skills necessary to perform the functions of a customer service representative. Plaintiff contends that Williams lacked sufficient education,[80] was unable to read or write beyond an elementary grade level,[81] lacked computer skills,[82] and frequently made mistakes on the job.[83] In addition, plaintiff contends that defendant has never employed a person of African-American heritage as an "office employee," which includes the position of customer service representative. Co-applicant Coy Williams amplified this point when he informed plaintiff that there had never been a African-American employee in the office, and defendant wasn't about to put one in there now.[84]

Ralph Smith, defendant's general manager, testified that he was the one who made the decision on the position, but admitted that office manager Linda Jones was involved in the selection process.[85] When Williams was selected, plaintiff asked Jones why

---

[80] Williams had not graduated from high school. *Id.*, Exhibit 5 (Smith deposition), at 111.

[81] *Id.*, Exhibit 6 (declaration of plaintiff), ¶ 15.

[82] *Id.*, Exhibit 2 (deposition of plaintiff), at 300.

[83] *Id.* at 293, 300.

[84] *Id.*, Exhibit 1 (Collier deposition) at 114-115; *Id.*, Exhibit 6 (declaration of plaintiff), ¶ 17.

[85] *Id.*, Exhibit 5 (Smith deposition), at 96-98. Smith discussed the various applicants with Jones, prior to making the employment decision.

he did not get the job.[86]  She replied, "I just chose Coy."[87]

Defendant now claims that Williams was hired due to his experience with the company, and his superior knowledge of defendant's products.[88]  Plaintiff maintains that defendant's proffered reasons are a pretext for intentional racial discrimination.

### 3.   The timeliness of plaintiff's Title VII failure to promote claim

Plaintiff's failure to promote claim based on Title VII is time barred, because plaintiff did not file his charge with the EEOC within 180 days of his rejection from the position he was seeking.  The record indicates that plaintiff filed his EEOC charge on September 2, 1997.  Thus, if the position plaintiff was seeking was filled more than 180 days prior to that date, plaintiff's claim should be barred.

While the evidence clearly establishes that plaintiff applied for the position of customer service representative in February of 1997, it does not reveal the date on which that position was filled.[89]  As such, the court finds that plaintiff has failed to

---

[86] *Id.* at 98.

[87] *Id.*, Exhibit 2 (deposition of plaintiff), at 297.

[88] *Id.* at 101-102

[89] Plaintiff's evidentiary submission (doc. no. 15), Exhibit 2 (deposition of plaintiff), at 287; defendant's evidentiary submission (doc. no. 12), Exhibit 7 (Smith affidavit), ¶ 3.

26

create a genuine issue of material fact as to whether his EEOC charge, pertaining to his failure to promote claim, was timely filed.[90]   Accordingly, plaintiff's failure to promote claim, premised on Title VII, is due to be dismissed.

### 4.   The timeliness of plaintiff's § 1981 failure to promote claim

In *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 461, 95 S.Ct. 1716, 1721, 44 L.Ed.2d 295 (1975), the Supreme Court stated that "the remedies available under Title VII and under § 1981, although related, and although directed to most of the same ends, are separate, distinct, and independent."   One distinction between the two statutes is that under Title VII resort to administrative procedures is a prerequisite to court action, while claims brought under 42 U.S.C. § 1981 can bypass Title VII's administrative stages, and proceed directly to court.   *Cf. Black v. Broward Employment and Training Admin.* 846 F.2d 1311, 1313 (11th Cir. 1988).

Another distinction pertains to the statutes' respective statutes of limitation.   Unlike Title VII, § 1981 does not have its own "built-in" statute of limitations.   Instead, § 1981 requires

---

[90] Although plaintiff generally alleged in paragraph two of his complaint that he had "fulfilled all conditions precedent under Title VII," this assertion is insufficient to meet his burden at summary judgment.   *See Jackson v. Seaboard Coast Line Railroad Co.*, 678 F.2d 992, 1010 (11th Cir. 1982).

courts to adopt the most analogous limitations period provided by state law. *Goodman v. Lukens Steel*, 482 U.S. 656, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987). In Alabama, the appropriate statute of limitations in § 1981 litigation is two years. *See Lane v. Ogden Entertainment, Inc.*, 13 F. Supp. 2d 1261, 1269 (M.D. Ala. 1998). Accordingly, plaintiff's failure to promote claim based on § 1981, is well within the applicable limitations period.

### 5.   All other issues

Upon consideration of the motion, evidentiary submissions, briefs, and pleadings, this court concludes that there exists genuine issues of material fact with respect to the following claims: plaintiff's failure to promote claim premised on 42 U.S.C. § 1981; plaintiff's hostile work environment claim; plaintiff's constructive discharge claim; and plaintiff's state law claims of negligent and/or wanton supervision, training, and retention.

### II. CONCLUSION

In summary, this court concludes that defendant's motion to strike plaintiff's affidavits is due to be denied in part, and granted in part. Defendant's motion for summary judgment shall be granted with respect to plaintiff's failure to promote claim based on Title VII, but denied as to all other claims. An order consistent with this memorandum opinion shall be entered

contemporaneously herewith.

DONE this __24th__ day of November, 2000.

_____
United States District Judge

29